# COURT OF APPEALS

OF

# NORTH CAROLINA

AT

# RALEIGH

---

STATE OF NORTH CAROLINA v. JOSEPH P. HIGGINS, JR.

No. 8312SC533

(Filed 17 January 1984)

**Criminal Law § 33.2— pawn tickets—inadmissibility to show motive for crimes**

In a prosecution for breaking or entering and larceny, pawn shop tickets signed by defendant on dates prior to the crimes charged were not admissible to show a motive for such crimes. In this case, the pawn shop tickets were improperly used to impeach collaterally defendant's testimony on cross-examination in which he denied committing other break-ins and pawning items taken during those break-ins.

Judge WHICHARD dissenting.

APPEAL by defendant from *Brannon, Judge.* Judgment entered 16 December 1982 in CUMBERLAND County Superior Court. Heard in the Court of Appeals 9 December 1983.

Defendant was convicted of felonious breaking or entering, felonious larceny, and assault with a deadly weapon with intent to kill inflicting serious injury.

At trial, the state's evidence, in summary, was as follows. On 26 July 1982 at about 5:30 p.m., James Smith upon returning to his home, was surprised by an intruder, whom Smith identified as defendant. According to Smith, defendant was armed with two pistols and shot him twice and then fled from the house. Smith saw defendant face to face for only a matter of seconds, but saw him clearly. Smith described his assailant to police as having

1

brown hair, in need of a shave, with a mustache. About two weeks later, Smith identified defendant from a line-up of six white males.

Following the shooting, Smith's assailant ran from the house to an automobile parked nearby. A neighbor, Donald Easterling, heard the shots and heard Smith "hollering" for help. Easterling observed a white male getting into a Mercury station wagon. Smith said: "[t]here's the guy that shot me." Easterling testified that "I think the defendant is the man I saw getting into the car." Bob Lund, another neighbor, witnessed the same events as Easterling, but did not get a clear look at Smith's assailant.

Gil Campbell, a detective of the Cumberland County Sheriff's Department, investigated the crime. On 28 July 1982, he went to defendant's residence in Robbins and arrested defendant. Detective William Proctor, who accompanied Campbell to defendant's residence, searched defendant's residence and car. In defendant's car, Proctor found a .22 caliber automatic pistol and an empty .32 caliber Smith and Wesson revolver cartridge shell. At the time of arrest, defendant had a day's growth of beard.

Defendant's evidence, in summary, was as follows. Deborah Wolfe testified that during the summer of 1982, she worked at The Pub, a Fayetteville bar owned by her mother, Mrs. Edwards. On 26 July 1982, she went to The Pub between 2:15 and 2:30 p.m. She recognized defendant in the courtroom. On the afternoon of 26 July 1982, defendant came to The Pub at about 2:30 p.m. Her mother told defendant that The Pub would not be open until 3:00 p.m. Defendant returned shortly after 3:00 p.m. and was there and was still in The Pub when Ms. Wolfe left about 6:00 p.m.

Jeanne Robertson testified that she worked at The Pub. When she arrived there at about 5:00 p.m. on 26 July 1982, Mrs. Edwards, Deborah Wolfe and defendant were there. Defendant left The Pub at about 6:00 p.m. Defendant was clean shaven, except for a mustache.

Virginia Edwards testified that defendant came to The Pub at about 2:30 p.m. on 26 July 1982, but left when told that they didn't open until 3:00 p.m.; that defendant returned shortly after 3:00 p.m. and remained there until about 6:00 p.m.; that she remembered defendant because she tried to convince him to try

Foster's beer, a beer popular with her customers, but that defendant didn't like it; that she talked with defendant off and on during that afternoon because he was the only customer that afternoon; that she watched defendant leave shortly after her daughter left because she wanted to be sure defendant wasn't following her daughter; and that defendant was clean shaven except for a mustache.

Defendant testified that he left his home in Robbins at about 10:00 a.m. on 26 July 1982 and went to the Fayetteville "unemployment office" to look for work. He learned of a possible job at Kelly-Springfield. He left there between 1:30 and 2:30 p.m. and went to lunch, then went to The Pub. He left his car in the parking lot with the key in the ignition because the key couldn't be removed. He remained in The Pub until 6:00 p.m. He owned the .22 caliber pistol found in his car, but had never seen the empty cartridge shell found there. Defendant had met James Smith before and had visited in Smith's home. Defendant denied breaking into Smith's home or stealing anything from it, and denied shooting Smith.

On cross-examination, defendant gave the answers indicated to the following questions.

Q. Was it earlier in the month of July that you had been there? (Fayetteville)

A. Yes, sir.

Q. Had you also been there in June?

A. Yes, sir.

Q. What were you doing in Fayetteville on those days?

A. I don't remember.

Q. Do you recall going to Ace Pawn Shop on June 28?

A. No, sir.

Q. You didn't pawn a Yashica camera at that time?

A. No, sir.

Q. Do you recall going to Rhudy's Pawn Shop on July 12?

A. No, sir.

State v. Higgins

Q. Do you recall going to Uncle Sam's Pawn Shop on July 20?

A. No, sir.

Q. You don't recall on July 12 pawning a Polaroid EE100 special land camera at Rhudy's?

A. No, sir.

Q. And on July 20 of this year you don't recall pawning a Remington .22 rifle at Uncle Sam's Pawn Shop on Murchison Road?

A. No, sir.

Q. Were you at the Cash Pawn on July 29 of this year?

A. No, sir.

Q. You don't recall pawning a 308 U.S. Springfield rifle on that date?

A. No, sir.

Q. Do you recall going to the Boulevard Pawn Shop on July 20?

A. No, sir.

Q. You don't recall pawning a .30-.30 caliber carbine rifle on that date?

A. No, sir.

Q. Do you recall going to Jim's Pawn Shop on July 20?

A. No, sir.

Q. You don't recall pawning a Marlin 334, .30-.30 caliber rifle?

A. No, sir, I don't remember going to any pawn shops.

. . .

Following this cross-examination, the record discloses the following exchange between the District Attorney, Mr. Boose, the trial judge, and counsel for defendant, Mr. Van Camp:

. . .

MR. BOOSE: May I approach the witness, Your Honor?

(A conference was held at the bench between Court and all counsel.)

COURT: Ladies and gentlemen of the jury, step out for a moment. We'll send for you when we can.

(Jury left courtroom.)

COURT: All right, Now, to repeat what you gentlemen told me here at the bench a moment ago. As I understand it, the solicitor has in hand copies of something. What is that?

MR. BOOSE: Photocopies of six pawn tickets.

COURT: All right. And just by way of summarizing, I surmise that those are allegedly pawn tickets from the pawn shops that you asked him about, the cross examination a few minutes ago?

MR. BOOSE: Yes, sir.

COURT: May I inquire further what is it you would set out to do?

MR. BOOSE: Well, Your Honor, he has denied being there and I want to ask if he recognizes his signature as being his. There is a recent case, *State of North Carolina versus La-Duke.* It says you don't need an expert to establish handwriting. They can look to establish similarity.

COURT: How does that pertain to this?

MR. BOOSE: We have his driver's license. We have his rights form. That will be a known signature witnessed by two officers and each one of these pawn tickets is signed Joseph P. Higgins.

COURT: I understand. I follow you as to what you're saying. Perhaps the logical questions [sic] is for what purpose?

MR. BOOSE: Well, now that he had denied it in Court, try to impeach him as to credibility as a witness.

COURT: All right. I have no problem with that. The only problem is the law says that such things may not be proved extrinsically. That is, by other evidence. It's a misnomer to say you are bound by his answer, but it is not a misnomer to say that you cannot introduce extrinsic evidence to show he's lying. That's a terrible word. To show that he misstated things. You may sift the witness, whatever that phrase may mean, but you cannot yourself introduce evidence contradicting a collateral point. And this is a collateral point, although I can think of some other basis upon which it might well be admissible as substantive evidence in this case.

MR. BOOSE: Your Honor, if you would like, we can call the pawn shop owners and people.

COURT: I understand that it is proving. I don't doubt that you can line up a room full of them. That is likewise — it is likewise extrinsic evidence of what is otherwise a collateral point.

The fact on direct examination he has testified to being in Fayetteville when he was in the service. He has further testified, as I recall, and correct me, that he had been back here very few times, maybe looking for jobs. That was his testimony on direct examination, was it not?

MR. VAN CAMP: I heard him say he was here in June sometime.

MR. BOOSE: On cross.

MR. VAN CAMP: On cross.

COURT: Part of the evidence in this case up 'til now deals with familiarity with the Fayetteville area, travel times back and forth between Robbins and here. So if it's the sole purpose, were impeachment of his credibility, then you're bound by his answer. But if it has another purpose —

MR. BOOSE: Well, Your Honor, also to establish, like you said, that he was here in town.

COURT: Let me have the dates. I'm just asking.

MR. BOOSE: Okay. June 28.

COURT: Of '82?

MR. BOOSE: Yes, sir. July 12, of '82.

COURT: July when?

MR. BOOSE: 12 and July 20 of '82.

COURT: Are they admissible for the sake of showing that he was short of money and needed money and hence evidence tending to show a motive for the crime on the 26th?

MR. VAN CAMP: Because that's not the stated purpose of what the attorney has said.

COURT: I understand that. I stated that if the purpose is—

MR. VAN CAMP: Well, that's not if it's—that's what he said the purpose was and your quotation of law is, I can't say it any better. That is the purpose for which he intended.

COURT: If the purpose is to impeach his veracity, then in a sense you are bound by his answers although you may further sift him again. We save parameters on that, but if the purpose were to show that on three dates prior to, but no date afterward, that on dates prior to July 26 he was selling things in pawn shops or hocking them or whatever you want to call it—very few people take things to pawn shops intend to come back and get them—to show his impoverished condition and therefore show a crime. If he can use that on rebuttal, he would be entitled to inquire about it now.

MR. VAN CAMP: Your Honor, we are assuming a set of circumstances which is not what the State has said they were doing.

There may be—I don't know—for the purpose of argument. I know that for the purposes for which he stated and staked himself out, that is what he intended to do, that it's not admissible. And I don't know that it behooves us to sift the prosecutor or to show him how to try his case; I mean strategy.

MR. BOOSE: If Your Honor like, I'll have the jury come back in, ask him another question and then offer them for yet another purpose and if I could list off some reasons.

COURT: What is this whole pawn shop thing? What did you have there?

MR. BOOSE: Six pawn shop tickets to show he was up here and show his Florida driver's license for identification. There's a signature on these. All these are very similar, all are very similar to the rights form.

COURT: Let me see defendant's Exhibit Number 1. Solicitor, again, this may be totally collateral. The driver's license in this state is for four years.

MR. VAN CAMP: No. It's the next birthday within four years. It's your birthday within four years.

COURT: Okay. That explains something I didn't understand.

MR. BOOSE: Your Honor, he indicated he turned his Florida driver's license in to get that. That issue date is 7-22-82. These are all prior to 7-22-82, which means he would have had to have his Florida driver's license at that time.

MR. VAN CAMP: If Your Honor please, my client was asked if he had been to these various pawn shops to pawn various items of property on various dates. To each question he replied in the negative. The State then got copies of four pawn tickets showing to me, to show that, they were making a statement to me to show that they had a signature, alleged signature with a similarity.

The jury went out and at that time the State asked for what purpose these items, to show that he in fact did do what he is now denying, that he did or words to that effect. That's to answer your question of five minutes ago. Where are we and where are we going.

Your Honor, I contend that that is seeking to prove a totally collateral matter or to disprove a totally collateral matter. I think it's totally improper for the purposes for which he attempts to do it.

COURT: If that is the purpose, then I agree.

MR. VAN CAMP: It's not if, it's what he said.

COURT: I was trying to see—I take it that there's no quarrel but pecuniary need may provide a motive to commit a crime of access?

MR. VAN CAMP: Except my client has denied that he did those things, if Your Honor please.

COURT: I understand.

MR. VAN CAMP: Even if they were to submit those things now, it would be again to prove something he has denied, which would be a collateral matter.

COURT: But the motive—

MR. VAN CAMP: It's not necessary in North Carolina.

COURT: It's not necessary, but it's the circumstantial proving.

MR. VAN CAMP: But that's not what the State said they are seeking to prove.

COURT: I'm not entirely sure. I have asked from time to time. I've heard one basis and then another pop up.

For instance, this morning you advised me of something you wanted to put at some point in the record, which you wanted, if you remember, put in the record.

MR. VAN CAMP: On convictions, Your Honor.

COURT: People have—

MR. VAN CAMP: My thought eminated [sic] from me.

COURT: I understand that. Mr. Solicitor, you have another problem. You have copies there, not the originals. Where are the originals?

MR. BOOSE: Next door in the burglary office.

COURT: Let me just inquire, are those photocopies of things that you have some kind of local ordinance that requires pawn shops to turn in here?

MR. BOOSE: Yes, sir. And also there are indications, notes on here showing that.

COURT: Come up here.

MR. BOOSE: Some of these items were put on hold by the police department here. It also goes to intent, motive, prior commission of same type of crimes.

COURT: The plot thickens. Let's do this. First, I want these six copies put in order of the date. We'll mark them Voir Dire 1 through 6 in the order that they're dated, which presumably is the date of alleged attendance in the place.

. . .

COURT: Everybody take your place, back to your place. All right. At this particular junction, the jury being out and having been out, we will do it in the following posture.

Mr. Solicitor, at this moment if we were to have the originals here of these things that I now have copies of marked V-2 through V-7 or V-6(1) and (2), if the originals were here, for what purpose would you be attempting to use those originals?

MR. BOOSE: Your Honor, to be blunt, several purposes.

COURT: Purposes then.

MR. BOOSE: Okay. One, to show impeachment of credibility as to clearly making a statement.

COURT: That you can't do.

MR. BOOSE: Okay. Second is to show that he was, testified he was unemployed, been looking for a job, show the need for money. He was familiar with how to get money with pawn tickets up here; to show he was familiar with the Fayetteville area, has been to Fayetteville more than he said. Also to show—

COURT: We're not concerned with credibility here.

MR. BOOSE: Also to show motive, why he would break into a house up here in Fayetteville; the fact that he was in need of money.

He's testified on direct that he was in Mr. Smith's house since '75 and '76. Mr. Smith testified that he had.

COURT: It's in the record.

MR. BOOSE: Initially, I asked him. He's had opportunity to observe the items that were taken. There is testimony that it was not ransacked. The items, the silver specifically, was placed, and a handgun, it was all placed in a little bundle ready to go.

COURT: Those are the multitudinous purposes?

MR. BOOSE: And additionally, Your Honor, pending his answers to some questions about the break-ins in Moore County, a Mrs. Raymond and a Mr.—a Mr. and Mrs. Raymond and a Mr. and Mrs. Hussey, as to evidence of what similar crimes.

COURT: They're the alleged homeowners in alleged Moore County?

MR. BOOSE: Right, Your Honor.

MR. VAN CAMP: There is a Moore County.

COURT: Well, I'm not going to assume anything for the sake of argument.

All right. First off the Court will rule at this time that since the evidence is admissible to show motive—listen carefully, Mr. Solicitor, I don't want any mistakes. You going to listen?

MR. BOOSE: Excuse me, your Honor.

COURT: You may ask him about other crimes for impeachment purposes for which you have a good faith basis. It would obviously appear that what you have here would constitute a good faith basis.

Mr. Solicitor, have other people, either you or your detectives, have they examined these pawn shop tickets and compared them with the handwriting available to you either on this driver's license or on your waiver of constitutional rights?

MR. BOOSE: Your Honor, I have looked at it through the—I didn't have the driver's license until he showed it to me a moment ago. I noticed the similarity now. Also the Voir Dire 30, the rights form.

COURT: You have compared that?

MR. BOOSE: Yes, sir.

COURT: In your personal, professional opinion, did one person make all the signatures?

MR. BOOSE: Yes, Your Honor.

COURT: That would appear to constitute a good faith basis of the Moore County things.

. . .

COURT: Well, again being precise, they're not going to put any copies of pawn tickets before the jury; only if they have originals are they going to proceed in any fashion with that for the jury. They'll have lunchtime to find the originals. But even the copies provide them with a good faith basis to inquire into prior bad acts insofar as they may deal with credibility. Now they're bound by what answer they get.

MR. VAN CAMP: Absolutely.

COURT: Will you let me finish.

MR. VAN CAMP: Well, I just wanted to agree with Your Honor.

COURT: No, no, please. Now, that deals with just credibility. We leave open so I can read a few cases and think about it.

In the first place, they don't even begin, from what the solicitor told me, the evidence we leave open, as to whether or not they will be able to deal with other crimes as some evidence tending to show such similarities, MO and the like; but they have it now. I haven't heard it, at least, and they can't ask it, and they're bound by what they deal with on credibility.

. . .

So, we have three possible uses of the evidence. Credibility we have just about exhausted for the moment. Other than you can ask about prior bad acts, but you cannot phrase it in terms of have you been charged with or arrested for. You can phrase it, on X date, did you commit X offense? You are bound by what the answer may be.

When you have originals and you go back to your case, then you may well be able to establish and deal with the terms of motive and we simply hold in abeyance any kind of usage to show — of other crimes to show identity of the perpetrator or anything else.

MR. VAN CAMP: As I understand it, as we've had some confusion with regard to statements in the past, we are not going to go into the area or the State is not to go into this area any further?

COURT: I said on their case.

MR. VAN CAMP: I mean at this time. That's — we're on my case now.

COURT: I understand your case is a different thing altogether.

MR. VAN CAMP: But they cannot go into it at this time?

COURT: No, sir. I said on their case they cannot go, but it may be —

MR. VAN CAMP: I would like to continue then this voir dire and we're not in here having to go on evidentiary points. I don't know where he's going.

COURT: I don't either.

MR. VAN CAMP: I would ask for a voir dire on the whole issue of where the State is going with these pawn tickets.

COURT: Mr. Solicitor, what did you intend to do with the pawn tickets?

MR. BOOSE: Show that he was in Fayetteville on dates. It's not to show he has committed break-ins before.

COURT: You can't use the pawn tickets for the purpose of—you can use the pawn tickets to satisfy yourself in your own mind that there's a good faith basis to ask him about alleged break-ins in Moore County.

MR. BOOSE: And also to show, Your Honor, to show—

COURT: Until you get the originals of the pawn tickets, you can't even begin to use any.

MR. BOOSE: Also, to show that this time period, from June 28 up until July 26, less than a month, he was in need of money; that he visited five or six Fayetteville pawn shops, not just one.

COURT: That would come, Mr. Solicitor, if you have the originals and on your own case, referring to rebuttal, for it would come then, referring to motive. Is that what you're talking about, Mr. Van Camp?

MR. VAN CAMP: I don't know. I'll say this for the record. Up to this point, I think we had a nice, clean trial. If your Honor please, I just hate to see—I think the issue here is one of identity, whether or not this man committed a crime here, and I think they are trying to prove a collateral matter in a wrong way.

COURT: I think I delineated well enough.

MR. VAN CAMP: Your Honor please, I object to any introduction of those tickets or their originals and that they are bound by his answers that he was not at those pawn shops; he did not pawn anything on those dates set forth.

COURT: Anything else?

MR. VAN CAMP: No.

COURT: Let the jury come in. Mr. Solicitor, I repeat, do not use those pawn tickets at this time in the presence of the jury other than perhaps to look at them on your own desk to refresh your recollection as to what questions you may properly ask.

. . .

Cross-examination of defendant was then resumed, showing the following:

Q. Mr. Higgins, do you know a Harold, a Mr. and Mrs. Harold Hussey?

A. No, sir.

Q. Is your wife's maiden name Hussey?

A. Yes, sir.

Q. Do you know if they're related to her in any way?

A. No, sir.

Q. Did you pawn various items belonging to the Husseys?

A. No, sir.

Q. Did you take any household goods from the Hussey residence on July 6 of this year?

A. No, sir.

Q. Did you in fact break and enter the residence of the Husseys on July 6 of this year?

A. No, sir.

Q. Do you know a Mr. and Mrs. Raymond?

A. No, sir.

Q. On or about July 8 of this year, did you take various household items from them?

A. No, sir.

Q. Specifically, did you take a 308 semi-automatic rifle?

A. No, sir.

Q. .38 Winchester Special pistol?

A. No, sir.

Q. Panasonic AM/FM tape player?

A. No, sir.

Q. Pair of Bushnell binoculars, Sony headphones, three hunting knives?

A. No, sir.

Q. A Remington Mark III electric razor?

A. I have never taken anything from anybody's residence.

Q. You also did not break into the residence of the Raymonds?

A. No, sir.

. . .

The following events then occurred.

COURT: All right. Everybody in place. All right. The record would show that we held a brief conference after lunch the upshot of that the Court advised counsel for both sides that the item of pawn tickets and fact, alleged fact that the defendant pawned various items would, on the State's rebuttal, treated as their case in chief, be allowed in evidence in a limited fashion; and that is to say the State would be allowed to show that on the dates most close to the alleged crime of July 26, 1982, that is three or more alleged pawnings on July 20, 1982, the State would be allowed to introduce evidence tending to show that the defendant did in fact pawn items for money on that date for the purpose of the—for the limited purpose of showing that the defendant was a pecuniarialessly [sic] impoverished condition at that time and hence implying a possible motive for the commission of crimes of access with felonious housebreaking and felonious larceny. In that, the Court would treat as remote any alleged pawnings on June 26 and July 6 out of an abundance of caution. The Court noted that it could perversely perhaps be contended by the defendant now or on appeal that pawnings on the earlier dates would be more relevant on the theory that that money had been spent by the 26th, whereas money gained on the 20th would still be in pocket or in hand; and hence provide a counter-motive to the break-in. And counsel for the defendant assured the Court that that was not a con-

tention that would be made now or in the future; although they would object to any evidence, even on the 20th, and the Court further finds, counsel, that while the evidence might tend to show what, by way of characterization is firearms, things were pawned on the 20th, the Court would not allow any evidence showing their character as stolen goods or the like; but would be treated in, like any other respect as honest pawn and simply for the purpose of showing he needed money on the 20th.

. . .

COURT: All right. What must now be done. The State professes its final position of rebuttal evidence to offer into evidence four pawn tickets which are the copies kept by the pawn shops in connection with items allegedly pawned on the 20th of July, 1982, approximately six days prior to the events in question, is that correct, gentlemen?

. . .

COURT: You satisfied that's the way it's done?

MR. VAN CAMP: If Your Honor please. The defense is not going to have any objections to the fact they are copies.

COURT: The basis is simply not probative.

MR. VAN CAMP: It's not competent.

COURT: Your precise basis?

MR. VAN CAMP: Among others to be later enumerated. If Your Honor please, we would contend that what the State is attempting to do at this time is to introduce evidence which would tend or would be or could tend to impeach the defendant's testimony; that they have pursued this matter with regard to the pawn ticket on the basis, did you pawn these items? The answers were no. Did you break into the houses? and some of the names, some of the kinds of items that were stolen were enumerated. Did you pawn, did you take this kind of gun, that kind of gun? He denied that all.

And now, if Your Honor please, this is a collateral matter which the State is intending to introduce evidence on; that collateral matter which tends to impeach that which I say is improper and object.

COURT: I agree with you that it is immaterial and inadmissible for the purpose of impeaching him and his credibility as a witness, but the collateral for the issues involved for this purpose does rule that independent probative value of some evidence tending to show that he was financially embarrassed and impoverished within six days of the alleged crimes, hence was in need of money. That would be evidence tending to show a motive for the crime of felonious housebreaking and felonious larceny, being crimes of acquisition, receivable for that limited purpose alone. And the fact, evidence of Higgins' prior pawnings might be pertinent to, but the Court has ruled and does rule that a probative value of those is outweighed by a possible prejudicial impact. So, we're going to limit it to just the six days before the events in question. And even then it's only admissible for intent to show motive.

. . .

Detective Proctor was then allowed to testify about the pawning activity defendant had denied on cross-examination and the tickets were shown to the jury.

*Attorney General Rufus L. Edmisten, by Associate Attorney K. Michele Allison and Special Deputy Attorney General Charles J. Murray, for the State.*

*Van Camp, Gill & Crumpler, P.A., by James R. Van Camp, for defendant.*

WELLS, Judge.

In his first argument, defendant contends that the trial court erred in admitting the pawn shop tickets signed by defendant on the grounds that the pawning of property by defendant would be relevant to show a motive for the crimes for which he was being tried, the effect of such evidence being to improperly impeach defendant and suggest his guilt of other crimes. In his second

argument, defendant contends that the trial court erred in encouraging the State to offer rebuttal evidence which would not have been admissible during the State's case in chief and which was not related to evidence presented in defendant's case in chief. We shall combine these arguments for discussion.

While evidence of motive is not necessary to establish that a criminal offense has been committed, *see* 1 Brandis, North Carolina Evidence, § 83 (2d rev. ed. 1982), such evidence may, in a proper case, be relevant as a circumstance tending to make it more probable that the person accused committed the offense. *Id.* Hence, our appellate courts have held that evidence of pecuniary gain from the commission of an offense may be relevant to help identify the perpetrator, *id.* and cases cited therein. We cannot accept, however, the stretching of this rule of evidence to the extent of allowing evidence of an accused person's general need for money as being relevant or admissible to show motive to commit a robbery or a larceny. To do so would expose all generally needy persons to the risk of a finding of guilt based in part upon their need for the means of sustenance. We must, therefore, hold for the purposes of this case that the pawn shop ticket evidence allowed in the State's rebuttal was not admissible for the purpose of establishing a motive for the crimes for which defendant was being tried. *See* Annot. 36 A.L.R. 3d 839 § 11 (1971 & 1983 Supp.), for a discussion of this issue generally.

It is clear that the district attorney had the pawn shop ticket evidence available to him during the State's case in chief, and that with the help and assistance of the trial judge, the district attorney used the pawn shop ticket evidence to impeach collaterally defendant's responses to the State's cross-examination questions. Defendant having denied on cross-examination the pawning activity, the State was bound by his responses and could not contradict him through extrinsic evidence. *State v. Shane*, 304 N.C. 643, 285 S.E. 2d 813 (1982) and cases and authorities cited therein.

In this case, defendant had strong alibi evidence. His own credibility was essential to his defense. Admitting the pawn shop ticket evidence on "rebuttal" was prejudicial error.

In his third argument, defendant contends that the trial court erred in the sentencing phase of his trial. Anticipating that such

---
State v. Higgins
---

errors, if any, may not occur on re-trial, we deem it unnecessary to address them.

New trial.

Judge WEBB concurs.

Judge WHICHARD dissents.

Judge WHICHARD dissenting.

The majority opinion holds that evidence such as that in question is inadmissible to show motive to commit a robbery or a larceny. I believe the law is to the contrary.

It is that "[t]he existence of a motive is . . . a circumstance tending to make it more probable that the person in question did the act, hence evidence of motive is always admissible where the doing of the act is in dispute." 1 H. Brandis, North Carolina Evidence § 83, at 304 (1982). This Court has held that "evidence of [a] defendant's financial condition was relevant [and admissible] to show a motive for embezzlement." *State v. Pate*, 40 N.C. App. 580, 585, 253 S.E. 2d 266, 270, *cert. denied*, 297 N.C. 616, 257 S.E. 2d 222 (1979). Our courts also have allowed evidence that defendant needed money to be introduced as a motive for robbery, *State v. Cain*, 175 N.C. 825, 832, 95 S.E. 930, 933 (1918), and larceny, *State v. Walker*, 6 N.C. App. 740, 743, 171 S.E. 2d 91, 93 (1969).

I do not agree with the statement in the majority opinion that application of the foregoing rule to the facts here stretches the rule. I believe, instead, that the majority opinion attempts to gloss the established rule in a manner which implicitly overrules numerous prior cases, including those cited above.

I agree that the context in which the evidence was admitted is troublesome. It was initially offered to impeach the witness, a purpose for which the State concedes it was inadmissible. The trial court then assumed the role of coach to the prosecution, suggesting that the evidence be offered for other purposes. The effect of admitting the evidence at this juncture was to allow the prosecution to accomplish indirectly what it could not accomplish directly.

Nevertheless, "the incompetency [of evidence] for one purpose will not prevent its admission for other and proper purposes." 1 H. Brandis, North Carolina Evidence § 79, at 292 (1982). For reasons indicated above, I believe the evidence would have been proper, as a part of the State's case in chief, to show motive. The trial court thus had discretion to permit its introduction at any time prior to the verdict. G.S. 15A-1226(b).

While the trial court's gratuitous assumption of the role of coach to the prosecution is of questionable propriety, I am unwilling to raise the impropriety, if any, to the level of an abuse of discretion. I therefore respectfully dissent, and vote to find no prejudicial error in the trial.

There was no evidence that defendant was hired or paid to commit the offense. It was thus improper for the court to find, as an aggravating factor, that the offense was committed for pecuniary gain. *State v. Thompson,* 309 N.C. 421, 422, 307 S.E. 2d 156, 158 (1983); *State v. Abdullah,* 309 N.C. 63, 77, 306 S.E. 2d 100, 108 (1983). The case should, on that account, be remanded for resentencing. *State v. Ahearn,* 307 N.C. 584, 602, 300 S.E. 2d 689, 701 (1983).